# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

**FILED**

JUL 0 1 2008

MAGISTRATE JUDGE P. MICHAEL MAHONEY
United States District Court

UNITED STATES OF AMERICA

v.

EDWARD F. BACHNER IV

**CRIMINAL COMPLAINT**

CASE NUMBER: 08 CR 50029

(Name and Address of Defendants)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.  On or about June 30, 2008, at Algonquin, and elsewhere, in the Northern District of Illinois, Western Division, EDWARD F. BACHNER IV, defendant herein:

(Track Statutory Language of Offense)

> knowingly possessed a biological agent, toxin or delivery system, namely, Tetrodotoxin, of a type or in a quantity that, under the circumstances is not reasonably justified by a prophylactic, protective, bona fide research, or other peaceful purpose,

in violation of Title 18, United States Code, Section 175(b).  I further state that I am an FBI Special Agent and that this complaint is based on the following facts:

**SEE ATTACHED AFFIDAVIT.**

Continued on the attached sheet and made a part hereof:  __x__ Yes  ____ No

Signature of Complainant
Curtis L. Hampton, Special Agent, FBI

Sworn to before me and subscribed in my presence,

June 30, 2008
Date

at Rockford, Illinois
City and State

P. Michael Mahoney, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

State of Illinois         )
                                )    SS
County of Winnebago    )

## AFFIDAVIT

I, Curtis L. Hampton, Special Agent with the Federal Bureau of Investigation ("FBI"), Chicago, Illinois, do hereby depose and state as follows:

1.    I am a Special Agent employed with the Federal Bureau of Investigation. I have been employed by the FBI since 2003. I am currently assigned to the Chicago Field Division of the FBI. In my capacity as a Special Agent, I have received specialized training in investigating terrorism-related offenses, including violations related to the attempted possession and possession of weapons of mass destruction and biological weapons.

2.    This affidavit is made for the limited purpose of supporting a criminal complaint against Edward F. Bachner IV. I have not stated every detail of the investigation which is known to me, but have provided facts to establish probable cause in support of the criminal complaint charging Edward F. Bachner IV with a violation of Title 18, United States Code, Section 175(b).

3.    This affidavit is based upon my personal knowledge obtained from my personal observations, interviews of witnesses, review of documents, reports, and information received from other law enforcement agents and investigators. Because of the limited purpose of this affidavit, it does not contain all information that is known to law enforcement regarding this investigation.

4.    18 U.S.C. Section 175(b) states in pertinent part that:

> Whoever knowingly possesses any biological agent, toxin, or delivery system of a type or in a quantity that, under the circumstances, is not reasonably justified by a prophylactic, protective, bona fide research, or other peaceful purpose, shall be fined under this title, imprisoned not more than 10 years, or both.

5.    The affidavit of Special Agent Mark R. Mahoney is attached hereto and incorporated by reference herein as Exhibit 1.

6.    On June 30, 2008, at approximately 10:00 a.m., a Special Agent of the FBI acting in an undercover capacity ("U/C") called Edward F. Bachner, IV ("Bachner") on Bachner's cellular telephone and left a voice mail message that informed Bachner that his Federal Express package arrived at the UPS store in Algonquin, Illinois:

7.    On June 30, 2008 at approximately 10:45 a.m., Bachner went to the UPS Store located at 2413 West Algonquin Road, Algonquin, Illinois and opened private mail box #302. Prior to his arrival, the FBI had inserted a notice directing Bachner to sign for his Federal Express package with a store employee at the customer counter. When Bachner arrived he opened mail box #302 and then approached the customer service counter and spoke to an undercover FBI agent posing as a UPS store customer service employee. The U/C produced 2 paper forms for Bachner to read and sign indicating among other things, that the package contained hazardous material. Bachner appeared to read the forms and then signed one page. The U/C then handed Bachner a styrofoam box that contained 1 milligram of Tetrodotoxin in a sealed vial. After Bachner took possession of the box containing Tetrodotoxin, he began to leave the store. Once he left the store, several FBI agents approached Bachner and took him into custody.

8.    On June 30, 2008, FBI agents began to execute a search warrant at the defendant's residence. That search is ongoing at the time of the presentment complaint and is expected to last an indefinite period of time. At present time, agents have located 6 empty Tetrodotoxin vials in Bachner's residence, multiple needles and syringes, and a book that with deals the effective doses for poisoning people.

FURTHER AFFIANT SAYETH NOT.

Special Agent Curtis L. Hampton
Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO BEFORE ME
me this 30th day of June 2008.

P. MICHAEL MAHONEY
U.S. Magistrate Judge

2

State of Illinois        )
                        )    SS
County of Winnebago   )

### AFFIDAVIT

I, Mark R. Mahoney, Special Agent with the Federal Bureau of Investigation ("FBI"), Chicago, Illinois, do hereby depose and state as follows:

1.     I am a Special Agent employed with the Federal Bureau of Investigation. I have been employed by the FBI since 2004. I am currently assigned to the Chicago Field Division of the FBI. In my capacity as a Special Agent, I have received specialized training in investigating terrorism-related offenses, including violations related to the attempted possession and possession of weapons of mass destruction and biological weapons.

2.     This affidavit is made for the limited purpose of supporting a warrant for the premises listed on Attachment A for the items described in Attachment B. I have not stated every detail of the investigation which is known to me, but have provided facts to establish probable cause in support of my application for a search warrant. I make this affidavit in support of an application by the United States of America for the issuance of a warrant to search for and seize evidence related to violations of Title 18, United States Code, Section 175, instrumentalities of such violations and any fruits of the crime.

3.     This affidavit is based upon my personal knowledge obtained from my personal observations, interviews of witnesses, review of documents, reports, and information received from other law enforcement agents and investigators. Because of the limited purpose of this affidavit, it does not contain all information that is known to law enforcement regarding this investigation.

4.     18 U.S.C. Section 175(b) states in pertinent part that:

> Whoever knowingly possesses any biological agent, toxin, or delivery system of a type or in a quantity that, under the circumstances, is not reasonably justified by a prophylactic, protective, bona fide research, or other peaceful purpose, shall be fined under this title, imprisoned not more than 10 years, or both.

## I.    SUMMARY OF THE INVESTIGATION

5.     As explained in more detail below, I have learned that Edward F. Bachner, IV ("BACHNER") has ordered and received large quantities of Tetrodotoxin ("TTX"), a toxic substance that is a biological agent for purposes of Title 18, United States Code, Section 175, from legitimate United States distributors through the mail using the alias "Edmund Backer" by purporting to be a doctor doing research as part of an Illinois company "EB Strategic

1

Research." The investigation has revealed that there is no doctor by the name of "Edmund Backer" and there is no registered Illinois company doing business as "EB Strategic Research." Additionally, in 2006, BACHNER admitted to sending electronic mail messages ("emails") to various individuals seeking the murder of an unnamed woman.

## II.    BACKGROUND REGARDING COMPUTERS, THE INTERNET AND EMAIL

6.    I have both training and experience in the investigation of computer crimes. Based on my training, experience, and knowledge, I know:

    a.    The Internet is a network of computers and computer networks which are connected to one another via high-speed data links and telephone lines for the purpose of sharing information. Connections between Internet computers exist across state and international borders. Information sent between computers connected to the Internet frequently crosses state and international borders, even if those computers are in the same state.

    b.    Internet Service Providers ("ISPs") are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including telephone-based dial-up, broadband-based access via digital subscriber line ("DSL") or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, that the connection supports. Many ISPs assign each subscriber an account name - a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an ISP over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password. ISPs maintain records ("ISP records") pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format.

    c.    An Internet Protocol Address ("IP address") is a unique numeric address used to identify computers on the Internet. Every computer connected to the Internet (or group of computers using the same account to access the Internet) must be assigned an IP address so that Internet traffic sent from and directed to that computer is directed properly from its source to its destination. An IP address looks like a series

of four numbers, each in the range 0-255, separated by periods (e.g. 121.56.97.178) and is typically assigned to customers by ISPs. An ISP might assign a different IP address to a customer each time the customer makes an Internet connection (so-called "dynamic IP addressing"), or it might assign an IP address to a customer permanently or for a fixed period of time (so-called "static IP addressing"). Either way, the IP address used by a computer attached to the Internet must be unique for the duration of a particular session: that is, from connection to disconnection. ISPs typically log their customers' connection, which means that ISPs can, for a period of time, identify which of their customers was assigned a specific IP address during a particular session.

d.    The domain name identifies a computer or group of computers on the Internet, and corresponds to one or more IP addresses assigned to those computers. Domain names are typically strings of alphanumeric characters, with each "level" of the domain delimited by a period (e.g., Computer.networklevel1.networklevel2.com). Domain names are used to make finding and accessing network resources easier and to limit the need for end-users to know specific IP addresses assigned to a particular resource (e.g. The IP address for "abc company" may be 10.47.53.126, while the corresponding domain name an end-user would only have to know might be www.abccompany.com).

e.    As explained below, this investigation has determined that one or more computers are located at 5704 McKenzie Drive, Lake in the Hills, Illinois, and such computer(s) is/are being used as an instrumentality in the course of, and in furtherance of violations of Title 18, United States Code, Section 175.

## II.    SUMMARY OF THE EVIDENCE

### A.    Evidence related to BACHNER's Order, Receipt and Possession of TTX

7.    On June 12, 2008 at approximately 8:36 A.M., Ascent Scientific LLC ("Ascent"), a wholesale chemical supplier with an office in New Jersey, received an electronic purchase order from an individual identifying himself as, "Edmund Backer of EB Strategic Research," which as explained below is an alias used by BACHNER. The purchase order states in pertinent part as follows:

| | |
|---|---|
| Company Name: | EB Strategic Research |
| Title: | Mr. |
| First Name: | Edmund |
| Last Name: | Backer |
| Address1: | 2413 West Algonquin # 302 |
| City: | Algonquin |
| County: | USA (sic) |

3

State:                  Illinois
Zipcode:                60102
Country:                United States
Telephone:              6306608945
Email:                  stratresearch@nyms.net
Order Number:           061208a
TAX number:             2057485931
Recipients email
Address:                stratresearch@nyms.net

This electronic purchase order, order number 061208a, sought 98 milligrams of TTX at a cost of approximately $72.00 per milligram for a total cost of approximately $7,056 plus shipping and other costs. The purchase order requested payment by invoice.

8.  Based upon an interview with a customer service representative of Ascent in New Jersey ("Ascent Employee"), Ascent provides chemical products and services to the pharmaceutical and chemical industries. Ascent's website allows users to place an electronic order for TTX.

9.  According to the Laboratory Division of the FBI, and the "Poisoning and Toxicology Handbook", 4th edition, Tetrodotoxin, which is also referred to or known as, TTX, anhydrotetrodotoxin 4-epitetrodotoxin, and tetrodonic acid, is a neurotoxin that has no known antidote and can only be treated with supportive therapy that lessen the severity of symptoms. TTX blocks action potentials in nerves by binding to the pores within nerve cell membranes known as sodium channels. Numerous animal species carry TTX naturally, including puffer fish species. Poisoning by TTX occurs naturally when toxin-bearing animals are consumed. This type of poisoning has a historical fatality rate of about 50-60%. If death occurs, it is usually due to respiratory paralysis and can occur within 6-24 hours. The likelihood of survival is strongly dependant on the dose of TTX consumed.

10. According to the Laboratory Division of the FBI, there is no experimental data directly linking consumption of known quantities of TTX with human response because the end result may be death. Human toxicity estimates are ascertained following food poisoning incidents by measuring the quantity of TTX in the food known to have been consumed and factoring the quantities eaten by the victims. Based on this approach, and according to the "Poisoning and Toxicology Handbook", 4th Edition, and "Casarett and Doull's Toxicology, The Basic Science of Poisons," 6th Edition, it is generally thought that a human oral lethal dose is in the range of 0.7 to 4 milligrams for a 132 to 165 pound person.

11. According to the Laboratory Division of the FBI, TTX is commonly used in bona fide research including basic neurophysiology and anesthesiology. Bona fide researchers generally have academic degrees at the level of Ph.D., M.D., or Pharm.D. Persons with lesser degrees working with TTX generally do so under the supervision of principal investigators with advanced degrees, in the capacity of employees or students. Additionally, according to the Laboratory of the FBI and open source material, research, such as neurophysiology, anesthesiology, and pharmacological research, is the primary known

4

prophylactic, protective or peaceful use of TTX. Additionally, according to open source information and records from distributors of TTX, TTX is often sold with an additive, such as Citrate.

12.    According to 42 CFR 73.4, TTX is a "select agent" that requires a special registration with the Center for Disease Control and Prevention ("CDC") in the event that an individual or entity will possess more than 100 milligrams of TTX. Scientists are required to register with CDC to utilize TTX for research purposes above the 100 milligram threshold. Totals less than 100 milligrams are exempt from registration with the CDC.

13.    Additionally, TTX is biological toxin for purposes of 18, United States Code, Section 175 as set forth by Title 18, United States Code, Section 178.

14.    On June 12, 2008, at approximately 11:39 A.M., Ascent Employee sent an email to "Dr. Backer" at stratresearch@nyms.net and stated in pertinent part[1]:

> We are unable to process your order at this time.
> Tetrodotoxin is a highly restricted substance. Your order exceeds our
> single purchase maximum. Please provide written verification of the
> following:
> Signed W-9
> Copy of CDC TTX Permit
> D&B #
> NAICS#
> Business Name
> Physical address of business
> Telephone number of business
> Fax number of business
> Website address
> How long in business
> Number of employees
> Business classification
> Type of research applications for which product will be used.

15.    On June 12, 2008, at approximately 12:29 P.M., "Dr. Backer," using the stratresearch@nyms.net email address, sent an email to customerservice@ascentscientific.com stating in part:

> Need tetrodotoxin quickly for marine antioxin research purposes (our
> current supplier ran into inventory / supply issues and we are on the
> verge of a breakthrough). $72 / mg cost plus $30 overnight courier
> per your site. For a long-term customer relationship, we will compile

---

[1]For ease of reverence, this affidavit will reference "Dr. Backer", even though the investigation has identified "Dr. Backer" as an alias used by BACHNER.

5

and forward all needed paperwork and other information to you
shortly. In the meantime, what is your maximum quantity for a single
purchase? (We need 25mg asap, preferably tomorrow but can wait
until Monday to receive if absolutely necessary).
Please ship today and invoice us, or we can pre-pay by express-
sending the payment out to you later today. Please advise soon.
Thank you.
Dr. Edmund Backer
EB Strategic Research
2413 W Algonquin #302
Algonquin IL 60102 USA

16.   On June 12, 2008, at approximately 2:20 P.M., Ascent Employee emailed the
stratresearch@nyms.net email address and stated in pertinent part:

Since you have purchased TTX from a previous supplier in the past,
you know the regulations and you know I cannot ship without the
proper forms and valid information.

17.   On June 17, 2008, Ascent Employee contacted the FBI to advise of the correspondence
he/she had with "Dr. Backer" and his attempt to acquire TTX. Around that same time,
Ascent Employee stated that "Dr. Backer's" order was unusual in that typical purchases are
usually only approximately 2 milligrams.

18.   On June 18, 2008, at approximately 12:12 P.M., at the direction of law enforcement, Ascent
Employee sent an email to stratresearch@nyms.net that stated in pertinent part:

I am sorry for the delay following up on this. I was out. I am down
to my last 12X1mg Asc-054 TTX. Please let me know if you still
need it and if this quantity would be acceptable to start with and I will
place it on hold. I am waiting on a reply from our lab as to when I
will have more in stock.

19.   On June 18, 2008, at approximately 3:44 P.M., "Dr. Backer" using the email address
stratresearch@nyms.net sent an email to Ascent stating in part:

We still need the TTX. Please express ship it to our attention - arrival
tomorrow first thing am?

12x1mg Asc-054 TTX is fine to start with. Please forward when you
will have more TTX.
Thank you.
Dr. Edmund Backer
EB Strategic Research

6

2413 W Algonquin #302
Algonquin IL 60102

20.     On June 18, 2008, at approximately 7:26 P.M., "Dr. Backer" using email address stratresearch@nyms.net sent an email to Ascent stating in part:

> FedEx Priority Overnight (10:30am) for Friday am is fine. Invoice please.

21.     On or about June 20, 2008, at the direction of law enforcement, Ascent Employee placed a consensually monitored and recorded telephone call to (630) 660-8945, which was the phone number provided by "Dr. Backer" in his original order to Ascent. Based on this call, which went to an unknown individual's voicemail, and a subsequent review of subscriber records for telephone number      '( i, law enforcement determined that this number was not utilized by a "Dr. Backer" or BACHNER. However, as explained below, this phone number is very similar to a cellular telephone number      '' '' ' '' '' '' '', which is used by BACHNER.

22.     On June 20, 2008, at approximately 3:37 P.M., at the direction of law enforcement, Ascent Employee sent an email to "Dr. Backer" at stratresearch@nyms.net that stated in pertinent part:

> We tried to notify you of a quality control issue with the Tetrodotoxin, but evidently there was a typo with the telephone number.
>
> We are expecting a new batch of TTX on Tuesday of next week. We will be able to ship Tuesday for Wednesday delivery. However, as is policy, we need to verify your contact information. Please provide a correct telephone number at your earliest convenience.

23.     After Ascent Employee received no response to her email, on June 24, 2008, at approximately 10:48 A.M., at the direction of law enforcement, Ascent Employee sent an email to stratresearch@nyms.net that stated in pertinent part:

> Dear Dr. Backer,
> We have not heard back from you with regards to the email below.
> The new batch of TTX is in stock and we would like to ship your order. However, we need your corrected telephone number for FedEx.
> Please call customer service . . . before 2:30 today in order for us to schedule pick-up with FedEx for shipment today.

7

24.    On June 25, 2006, at approximately 4:52 P.M., "Dr. Backer," utilizing the email address of stratresearch@nyms.net, sent an email to Ascent stating in part:

> Please pardon my absence. I was called out of town on urgent family business and I have just now checked my email. The order status - 25mg is fine, so please ship asap for next day am delivery. Thank you.
>
> Dr. Backer
> EB Strategic Research
> 2413 W Algonquin # 302
> Algonquin, IL 60102

25.    A review of law enforcement databases revealed that the purported address of "Dr. Backer" and EB Strategic Research, 2413 West Algonquin Road, #302, Algonquin, Illinois, is actually a mailbox inside a United Parcel Service post office store ("UPS Store"). A review of open source and law enforcement databases did not identify any known and/or registered business or trade name registered as "EB Strategic Research." A review of open source and law enforcement databases also did not identify a Dr. Edmund Backer, Edmund Backer, Ph.D., and/or Edmund Backer, M.D. A review of open source and law enforcement databases did not identify any person or entity associated with tax payer identification number 2057485931, provided by "Dr. Backer" in the initial order to Ascent. Additionally, a review of open source and law enforcement databases did not identify any individual by the name of Edmund Backer residing in the state of Illinois. Moreover, based on records related to BACHNER's academic background, BACHNER appears to have never received an academic degree at the level of Ph.D., M.D., or Pharm.D.

26.    According to documents received from the UPS Store, mailbox 302 is rented to BACHNER under the business name of "EFB Strategics" at "5704 McKenzie Drive", email address "bachnerfinance@yahoo.com", and home telephone number of            1". The account for mailbox 302 was opened on April 18, 2006. When initially renting mailbox 302, BACHNER provided his Illinois vehicle operator's license number as            3, which State of Illinois records revealed is held in the name of BACHNER with an address of 2609 Briar Trail Road, Schaumburg, Illinois 60173. BACHNER also provided a 2006 Illinois Registration card for a 1997 Jeep Carry All with a registration TAZ2030, which Illinois records show is titled to BACHNER with an address of 5704 McKenzie Drive, Lake in the Hills, Illinois.

27.    On or about June 26, 2008, after receiving a grand jury subpoena from law enforcement agents for records related to mailbox 302, a UPS Store employee of his/her own accord provided agents with the recent mail and packages being held for mailbox number 302. Among the mail and packages was an envelope with a return address "Biotium, Inc. at 3423

8

Investment Boulevard, Suite 8, Hayward, California 94545-3829" ("Biotium") and post marked June 16, 2008. From observing the outside of the envelope and without opening the envelope, law enforcement agents, observed what they believe to be a check inside the envelope's address window that stated, "pay to the order of EB Strategic Research." According to Biotium's website, Biotium sells TTX.

28.    After learning on or about June 26, 2008 of a correspondence between Biotium and "Dr. Backer," law enforcement agents interviewed Biotium employee. According to an interview of the Operations Manager at Biotium ("Operations Manager"), Biotium has been doing business with "Dr. Edmund Backer" of "EB Strategic Research." Additionally, according to the Operations Manager and Biotium records, "Dr. Backer" has placed multiple orders with Biotium for TTX beginning in or about November 2006 and continuing to in or about May 2008. According to records from Biotium, Biotium has shipped at least 64 milligrams of TTX to "Dr. Backer", with a mailing address 2413 W Algonquin #302, Algonquin IL 60102, with the most recent shipment of 50 milligrams to "Dr. Backer" being sent on March 17, 2008. According to the Operations Manager and Biotium records, on or about June 11, 2008, a Biotium sales representative became concerned when "Dr. Edmund Backer" placed an order for 100 milligrams of TTX. BIOTIUM declined to process the order and informed Dr. Edmund Backer by email at address stratresearch@nyms.net of the registration and select agent requirements set forth in 42 CFR 73.

29.    Based on Internet searches of "nyms.net", the email service provider used by Dr. Backer to correspond with Ascent and Biotium, that internet domain name is maintained by a company named Anonymizer, Inc ("Anonymizer"). According to records maintained by Anonymizer for the e-mail account, stratresearch@nyms.net, the subscriber information for that account is as follows:

| | |
|---|---|
| Name: | Edward Bachner |
| Username: | cromwel007 |
| Contact emails: | bachnerfinance@yahoo.com |
| Billing Address: | 5704 McKenzie Drive, Lake in the Hills, Illinois 60156 |
| Account Create Date: | 12/23/2004 |
| Originating IP Address of Traffic: | 209.242.32.65 |

30.    Based on Anonymizer's IP connection logs for "stratresearch", BACHNER attempted to log into the account 784 times from IP address 209.242.32.65 between April 21, 2008 and June 20, 2008.

31.    On June 26, 2008, a search from a publicly available website known as www.domaintools.com for information associated with the IP address 209.242.32.65 revealed that the address is owned by DLS Internet Services, located at 950 Oak Street, Lake

in the Hills, Illinois 60156.    The search of "whois", also a publicly available website, showed the following information regarding IP address 209.242.32.65:

> Org-Name:        Ed Bachner
> IP-Network:      209.242.32.64/29
> Street-Address: 5704 McKenzie Drive
> City:            Lake in the Hills
> State:           IL
> Postal-Code:     60156

32.    According to agents and investigators familiar with computer and IP protocols, the notation 209.242.32.64/29 refers to a sub-network of IP addresses. In particular, "/29" indicates a range of eight (8) IP addresses associated with the given sub-network. Additionally, according to domain.com, a publicly available website, the IP addresses in the range of 209.242.32.64 to 209.242.32.71 are listed to BACHNER with an address of 5704 McKenzie Drive, Lake in the Hills, Illinois.

33.    On June 23, 2008, agents and officers observed                     r, BACHNER's wife, driving the Honda exit and subsequently re-enter the garage attached to the residence at 5704 McKenzie Drive, Lake in the Hills.

34.    On or about June 24, 2008, law enforcement agents conducted surveillance on the property located at 5704 McKenzie Drive, Lake in the Hills, Illinois and observed the following two vehicles near the residence, both of which are registered to BACHNER at 5704 McKenzie Drive, Lake in the Hills, Illinois:

> (a)    1999 Chrysler Concorde bearing Illinois registration 8243475 parked in the garage of the residence ("Chrysler"); and
>
> (b)    2007 Honda Accord bearing Illinois registration G716738 parked in the garage of the residence ("Honda").

35.    On June 25, 2008, law enforcement agents observed BACHNER driving the Honda. Law enforcement agents were able to visually identify BACHNER based upon a comparison between observations made on surveillance and a picture taken for driver's license issued to BACHNER by the Illinois Secretary of State.

36.    A review of open source, law enforcement databases revealed that BACHNER is the current co-owner, along with his wife, of the real property known and numbered as 5704 McKenzie Drive, Lake in the Hills, Illinois.

37.    According to documents from the McHenry County Recorder of Deeds, on or about June 19, 2006, Wells Fargo Bank N.A. or its agent filed or cause to be filed a Lis Pendens and Notice of Foreclosure on the residence located at 5704 McKenzie, Lake in the Hills, Illinois

10

("Residence"). Additionally, on or about January 25, 2008, Wells Fargo Bank N.A. filed or caused to be filed a Lis Pendens related to foreclosure proceedings regarding the residence.

38. A review of the records of the Secretary of the State of Illinois revealed that BACHNER was issued driver's license number                      with an address of 5704 McKenzie Drive, Lake in the Hills, Illinois.

39. A review of the records of the Illinois State Police revealed that BACHNER was issued Firearm Owner Identification Card number              ID Card) with an address of 5704 McKenzie Drive, Lake in the Hills, Illinois. A further review of the records of the ISP reveal that BACHNER applied to purchase a firearm from a licensed firearm dealer selling firearms operating out of a residence in Lake in the Hills, Illinois. Additionally, in approximately November 2007, BACHNER purchased a Glock 34, 9 millimeter pistol.

40. Commonwealth Edison advised that the account for utilities for 5704 McKenzie Drive, Lake in the Hills, Illinois is held in the names or BACHNER and his wife.

41. Based upon my experience and discussions with FBI agents and other law enforcement agents or officers who have investigated individuals illegally purchasing dangerous and regulated substances, I am familiar with the ways in which individuals illegally purchasing dangerous and regulated substances, including biological weapons, conduct their purchases and concealment of such material, and I know that these individuals often keep the materials in areas which are secure from others and allow them ready access to the materials – criteria which include a personal residence. Often, such materials are also kept inside a locked container within a refrigerated area. Additionally, law enforcement is aware of no other residence or storage facility that is either registered to BACHNER or to which he has access. In addition, I know that these individuals often keep materials and tools of their illegal activity at one location. As explained above, the computers used by BACHNER to order TTX are located at 5704 McKenzie Drive, Lake in the Hills, Illinois and thus it is likely law enforcement will find additional evidence of these violations, including TTX, at that residence. Individuals illegally purchasing a dangerous and regulated substance, such as TTX, often purchase additional toxins and poisons as well as other potentially dangerous substances, such as insecticides. These individuals also often keep records related to these materials and their antidotes. In my experience and that of other law enforcement agents and officers, and scientists employed by the FBI laboratory that individuals who obtain these materials often mix the materials or manipulate the materials with other chemicals and biological substances requiring certain laboratory and safety equipment, such as the items set forth in paragraph 12 of Attachment B.

**B.    Evidence Related to BACHNER's Attempts at Arranging a Murder**

42. On or about July 25, 2005, the Knoxville office of the FBI received information from a cooperating witness ("CW") that he/she had contact on the internet with an individual who had requested CW's assistance in a murder. CW advised he/she posted a forum message on

certain websites stating that he/she was interested in obtaining an AK-47 assault rifle. Approximately two to three months following the initial forum request, CW received an e-mail message via his/her personal email from an unknown individual utilizing orcashrike@hushmail.com. The e-mail stated, "I've got a job for you" and within the email was an internet link to another website, Stealth.com. Once inside Stealth.com, CW received an encrypted message which prompted the reader for a password. Once CW provided the password, a new message appeared on the screen. The new message stated in summary, there is a woman living in Chicago that the sender of the message wanted killed, and if the reader of the message agreed, the sender would compensate the reader with an AK-47 rifle and $8,000.00.

43.    Hushmail is an email service that is located in Canada that is known among law enforcement to provide anonymity to users since the email servers are located outside of the United States of America. Stealth.com provides users the ability to send and receive encrypted messages secured by passwords known only to the intended recipient.

44.    At the control and direction of law enforcement, the CW proceeded to www.stealthmessage.com via a link provided by an e-mail from Orcashrike@hushmail.com dated August 16, 2005. The website required a password which was supplied by a clue from orcashrike@hushmail.com. The message began to decode and a clock began which limited the amount of time CW was allowed to view the message before it was removed. The message stated in part:

> Mark lives in Chicago NW suburb, works in Mount Prospect, IL. Female, 32, no firearms, combat or hand-to-hand training. Expected project completion time frame within 30 days. More info to follow. Non-targeted causes preferred (i.e. robbery gone wrong instead of a sniper shot) to preserve "randomness" of permanent-retirement actions. Please let me know if you are able to take on this project. Thank you."

45.    Through Canadian judicial procedures and an international agreement, and with the assistance of the Royal Canadian Mounted Police, the FBI obtained the stored communications of the e-mail address orcashrike@hushmail.com, the FBI learned that Hushmail does not maintain subscriber information for this type of account, nor does Hushmail collect IP addresses or transactional information for this type of account.

46.    Law enforcement agents obtained from Hushmail an e-mail communication, dated July 10, 2005, from orcashrike@husmail.com to punisherwannabe@gmail.com which states in pertinent part:

> I can get you a clean AK-47, completely untraceable to you in any way. Instead of having you pay cash for it, though, perhaps you can

do a job for me. Please reply if interested so we can discuss further.
Thank you.

47.    Law enforcement agents also obtained an email through stealth.com, dated on or about August 26, 2005, from orcashrike@hushmail.com to punisherwannabe@gmail.com which states in part:

> Subject: Project; Message: Subject lives in Algonquin, IL and works in Mount Prospect, IL. Home is pretty secure and non-involvement of friends or other family members is paramount so permanent retirement at either the work or errand locations (i.e. workout club - very early morning opportunities there) is strongly recommended. If we have an agreement, I can send you specific info that will get you within 5 yards of mark on (at least) any weekday. The rest would be up to you - this is intended as a simple termination, not a defilement of said mark.

48.    Subsequently, United States law enforcement with the assistance of Canadian law enforcement obtained a court order to require Hush Communications to capture the IP address of Hush Mail user, orcashrike@hushmail.com. Subsequently, law enforcement agents learned the user of the orcashrike@hushmail.com email address utilizes the unique IP address 209.242.32.65. Law enforcement determined that this IP address was associated with DLS Internet Services and BACHNER at 5704 McKenzie Drive, Lake in the Hills, Illinois 60156, home telephone number                  , cellular

49.    On January 25, 2006, BACHNER was interviewed by the FBI at his residence at 5704 McKenzie Drive, Lake In The Hills, Illinois regarding the emails related to a murder for hire plot. BACHNER identified his cellular telephone number as                  during the interview. BACHNER also informed the interviewing agents that he had several computers running in the basement of his residence. Additionally, BACHNER has his own laptop computer that he uses for personal reasons. BACHNER stated that such computers have access to the Internet. BACHNER explained that the connection from the computers to the Internet is hard-lined within the house, but the connection from the house to the Internet is wireless. BACHNER stated that his Internet Service Provider was DLS Wireless and that he has been with DLS Wireless for approximately one year. BACHNER stated that only he and his wife use their computers.

50.    BACHNER initially denied having any knowledge or involvement with the emails, email addresses or websites related to the email correspondence pertaining to plans to murder an unnamed female. Soon thereafter, agents informed BACHNER that it appeared to the interviewing agents that he was not being truthful. BACHNER was also informed that the individuals that he communicated with over the Internet have been identified and were currently being interviewed by the FBI. BACHNER was informed that the other interviewees may provide incriminating information regarding BACHNER. BACHNER responded by saying, "I never told them I was ED BACHNER." BACHNER then stated "I was bored. I had no intent."

13

## III.   CONCLUSION

51.   Based on the facts as stated in this Affidavit, there is probable cause to believe that evidence of a violation of Title 18, United States Code, Section 175 will be located on the premises described in Attachment A. According, I respectfully request that the court issue a search warrant for the premises described in Attachment A.

52.   Accordingly, I am seeking authorization to seize the evidence set forth in Attachment B.

53.   Based upon my knowledge, training and experience, I know that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, to insure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that some computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate such a computer be seized and subsequently processed by a qualified computer specialist in a laboratory setting. This is true because of the following:

   a. Computer storage devices (like hard disks, diskettes, tapes, laser disks, Bernoulli drives, optical drives) can store the equivalent of thousands of pages of information. Additionally, a user may try to conceal criminal evidence by storing it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

   b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. Data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis. Based on my training and experience I know that computer users sometimes encrypt files, and that such users may keep the encryption passwords or encryption keys separately written in their residences or on a separate computer file.

   c. Because of the volume of the data at issue and the technical requirements set forth above, it is usually necessary that the above-referenced equipment, software, data, and related instructions be seized and subsequently processed by a qualified

14

computer specialist in a laboratory setting. It may be the case, however, under appropriate circumstances, that some types of computer equipment can be more readily analyzed and pertinent data seized on-site, thus eliminating the need for its removal from the premises. One factor used in determining whether to analyze a computer on-site or to remove it from the premises is whether the computer constitutes an instrumentality of an offense and is thus subject to immediate seizure as such--or whether it serves as a mere repository for evidence of a criminal offense. Another determining factor is whether, as a repository for evidence, a particular device can be more readily, quickly, and thus less intrusively analyzed off site, with due consideration given to preserving the integrity of the evidence. This, in turn, is often dependent upon the amount of data and number of discrete files or file areas that must be analyzed, and this is frequently dependent upon the particular type of computer hardware involved.

54.    As explained above, law enforcement agents expect to find at Bachner's premises one or more "micro" or "personal" computers, which are used either as instrumentalities of criminal offenses or as storage devices for possible evidence of criminal offenses. These computers are likely to be standing alone or joined through a series of connected computers called a "network." Computers recognized in the computer trade as "micro" or "personal" computers share the characteristic that they are often small devices, often capable of being stored on or in a single desk or station. While the storage capabilities of such devices vary, micro or personal computers are more often designed to facilitate usage by a single individual. Because of these characteristics, physical removal of micro or personal computers is often the more practical alternative, and is often less intrusive than requiring federal agents to remain at the premises for the amount of time reasonably required to review, analyze, and copy pertinent data. Thus a presumption exists that such computers will be seized and subsequently processed by a qualified computer specialist in a laboratory setting for reasons set forth above.

55.    Based upon my knowledge, training, and experience, and the experience of other law enforcement personnel, I know that searches and seizures of evidence from computers taken from the subject premises commonly require agents to seize most or all of a computer system's input/output peripheral devices for a qualified computer expert to accurately retrieve the system's data in a laboratory or other controlled environment. Therefore, in those instances where computers are removed from the subject premises, and in order to fully retrieve data from a computer system, investigators must seize all magnetic storage devices as well as the central processing units (CPUs) and applicable keyboards and monitors which are an integral part of the processing unit.[2] If, after inspecting the input/output devices,

---

[2]The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in

15

system software, and pertinent computer-related documentation it becomes apparent that these items are no longer necessary to retrieve and preserve the data evidence, such materials and/or equipment will be returned within a reasonable time.

56.     A Special Agent of the FBI specially trained in computer evidence recovery will supervise the retrieval of digitally based evidence from the computers and residence located at 5704 McKenzie Drive, Lake in the Hills, Illinois. Based upon the nature of the alleged criminal activity, it is common for incriminating evidence of computer fraud and abuse to be secreted or deleted on a subject's computer system. In an effort to minimize the level of intrusion and inconvenience an attempt will be made to make a physical image (digital copy) of the digitally stored information on any computers located at the premises. If these on-site efforts to obtain an image of the computers fail, the computers will be removed to the offices of the FBI and/or the offices of the Regional Computer Forensic Laboratory ("RCFL") where it will be imaged and returned in a timely manner.

57.     Based upon my training and experience, as well as that of other Special Agents of the FBI, I believe that it is likely that a contemporaneous analysis of diskettes, backup tapes and other computer data storage media will be impractical and extremely time-consuming. For that reason, it will be necessary to seize such items so as to facilitate an off-site analysis to locate evidence authorized to be seized by this search warrant. Such procedure will also minimize the disruption to the residents of 5704 McKenzie Drive, Lake in the Hills, Illinois. Thus, I request authorization to seize such items for off-site analysis to locate evidence authorized to be seized by the search warrant. The digital storage media (floppy diskettes, removable disk drives, CD-ROM disks, backup tapes) will be removed to the offices of the FBI for imaging/analysis and will be returned to the owner as soon as possible.

FURTHER AFFIANT SAYETH NOT.

Special Agent Mark R. Mahoney
Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO BEFORE ME
me this 30th day of June 2008.

P. MICHAEL MAHONEY
U.S. Magistrate Judge

order to accurately retrieve the evidence listed above. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation. Without these items, it may be difficult to recreate the computer environment in which the seized data was created. This is important both for thorough analysis and for establishing the ultimate integrity of the seized data.

## **ATTACHMENT A**

The premises to be searched is a white-colored, two story, single family residence, located at 5704 McKenzie Drive, Lake in the Hills, Illinois, a picture of which is attached to ATTACHMENT A as Exhibit 1, with a red front door that has a clear glass storm door and windows on either side, dark colored shingles, and has an attached two car garage with one garage door, with the number "5704" placed above the garage door.   The premises also has an covered, attached front porch .   The second floor of the premises has a set of double windows with black colored shutters located on the left and right side of the front of the residence and an arched window that is located between the front right and front left double windows of the second floor.



Exhibit 1
to Attachment A

**ATTACHMENT B**

Law enforcement will search for the following items, in any form, including documentary, photographs, notebooks, books, albums, tapes, cassettes, and electronic form. Electronic form, which may reside on various media including computers, may include some the following: disk drives, data disks, system disk operating systems, magnetic media floppy disks, CD's, CD-R's, CD-RW's, DVD-R, Zip-disks, thumb devices, portable disk drives, tape drives, tape systems and hard drives, terminals (keyboards and display screens), word processing files, chat logs, electronic messages, other digital data files and web cache information, as well as records or files that may contain encrypted files or information.

1. Any and all records and materials bearing on the receipt, shipment, possession, manufacture, and/or delivery of Tetrodotoxin or any additive or mixing agent, such as Citrate, anhydrotetrodotoxin 4-epitetrodotoxin, tetrodonic acid, insecticides, toxins, antidotes, poisons or their derivatives, or their component chemicals, or chemicals related to the processing or manufacture of toxins, neurotoxins, poisons, or chemicals, chemical warfare agents, or nerve agents.

2. Records of communications between individuals concerning the topic of receipt, use, shipment, possession, manufacture, and/or delivery of Tetrodotoxin or any additive or mixing agent, such as Citrate, anhydrotetrodotoxin 4-epitetrodotoxin, tetrodonic acid, insecticides, toxins, antidotes, poisons or their derivatives, or their component chemicals, or chemicals related to the processing or manufacture of toxins, neurotoxins, poisons, chemicals, chemical warfare agents, or nerve agents.

3. Records of an online storage, e-mail or other remote computer storage subscription to include

unique software of such subscription, user logs or archived data that show connection to such service, and user login and passwords for such service. Financial documents, credit cards, record in any format and media reflecting the existence of credit accounts, debit cards or other financial services that could be used to pay for online services, including but not limited to subscription services, website access or online storage and online purchases.

4. Records of ownership or use of computer equipment or computer services including but not limited to, sales receipts, registration records, records of payment for Internet access, records of payment for access to newsgroups or other online subscription services, and notes.

5. Any correspondence, documents, books, manuals, instruments or text messages pertaining to the receipt, shipment, possession, manufacture, and/or delivery of of Tetrodotoxin or any additive or mixing agent, such as Citrate, anhydrotetrodotoxin 4-epitetrodotoxin, tetrodonic acid, insecticides, toxins, antidotes, poisons or their derivatives, or their component chemicals, or chemicals related to the processing or manufacture of toxins, neurotoxins, poisons, chemicals, chemical warfare agents, or nerve agents, and delivery or dispersal equipment for such materials.

6. Records related to address books, lists of names, lists of characteristics of individuals, computer screen names, e-mail addresses, records of the computer activity of any individual, addresses for personal web pages, and any lists of "chat room" or other "computer addresses" and any and all evidence of passwords needed to access any computer belonging to or in the possession of Edward F. Bachner IV.

7. Any records of logs, usernames or passwords used by Edward F. Bahcner IV to gain access to the Internet, and any software program or other computer program, including encryption programs.

8. Records of ownership, dominion or control over the residence at 5704 McKenzie Drive, Lake in the Hills, Illinois, and any storage locations or residences controlled by Edward F. Bachner IV, including rent receipts, credit cards, credit card receipts, contracts, rental agreements, correspondence and mail.

9. Tetrodotoxin or any additive or mixing agent, such as Citrate, anhydrotetrodotoxin 4-epitetrodotoxin, tetrodonic acid, insecticides, toxins, antidotes, poisons or their derivatives, or their component chemicals, or chemicals related to the processing or manufacture of toxins, neurotoxins, poisons, chemicals, chemical warfare agents, or nerve agents, and delivery or dispersal equipment for such materials.

10. Chemical glassware, coffee grinders, blenders, food processors, funnels, filters, chemical containers, presses, mortar and pestles, food choppers, knives, nut crackers and nut picks.

11. Purchase orders and receipts for Tetrodotoxin or any additive or mixing agent, such as Citrate, anhydrotetrodotoxin 4-epitetrodotoxin, tetrodonic acid, insecticides, toxins, antidotes, poisons or their derivatives, or their component chemicals, or chemicals related to the processing or manufacture of toxins, neurotoxins, poisons, chemicals, chemical warfare agents, or nerve agents, and delivery or dispersal equipment for such materials.

12. Any and all chemicals, biological substances and/or materials, derivatives, indicators, personal protection equipment, laboratory equipment, including but not limited to: ampules; sealed glass bulbs; breakers; cylindrical glass/plastic containers; binary weapon; burettes; chemical containers; liquid or dry reagents; condensers, containers utilized for distillation, extraction, and reflux; crucibles; desiccators; distillation apparatus; heat sources; flasks; glass tubing; thermometer; stir bars; anti-bumping granules; cooling bath; funnels; an improvised or industrial furnace; traditional scientific glassware; funnels, separators, cylinders, pipettes; a glove box, dry box or improvised controlled atmospheres; heating mantles; hydrometers; laboratory hoods; gas mask; breathing mask; mortar and pestle; pH paper; stirring rods/bars; storage containers; syringes; thermometers; tubes; tubing; vacuum filtration system; vacuum pumps; vials watch glasses; thermometers; tubes; tubing; agar plates; autoclave; bioreactor: centrifuge; and a kitchen scale/balance.

13. Any and all identification documents, including but not limited to driver's licenses, state identification cards, employee identification, and passports.

14. Any and all journals, address books, Rolodex records, and any other compilations of possible victims or recipients of Tetrodotoxin or any additive or mixing agent, such as Citrate, anhydrotetrodotoxin 4-epitetrodotoxin, tetrodonic acid, insecticides, toxins, antidotes, poisons or their derivatives, or their component chemicals, or chemicals related to the processing or manufacture of toxins, neurotoxins, poisons, chemicals, chemical warfare agents, or nerve agents, and delivery or dispersal equipment for such materials.

15. Safe deposit box keys, storage locker and storage container keys, and indicia of ownership of

safe deposit boxes and storage lockers in which the Tetrodotoxin or any additive or mixing agent, such as Citrate, anhydrotetrodotoxin 4-epitetrodotoxin, tetrodonic acid,  insecticides, toxins, antidotes, poisons or their derivatives, or their component chemicals, or chemicals related to the processing or manufacture of toxins, neurotoxins, poisons, chemicals, chemical warfare agents,  or nerve agents, and delivery or dispersal equipment for such materials may be secreted.

16. Bank statements and records, letters of credit, money orders, cashiers' checks, passbooks, canceled checks, certificates of deposit, loan records, customer account information, income and expense summaries, cash disbursement journals, financial statements, federal and state income tax returns, computer, disks, and software records containing financial data and information related to the receipt and other disposition of income and related financial information pertaining to purchase and sale of Tetrodotoxin.

17. All records related to the uses or possibly uses of Tetrodotoxin or any additive or mixing agent, such as Citrate, anhydrotetrodotoxin 4-epitetrodotoxin, tetrodonic acid,  insecticides, toxins, antidotes, poisons or their derivatives, or their component chemicals, or chemicals related to the processing or manufacture of toxins, neurotoxins, poisons, chemicals, chemical warfare agents,  or nerve agents, and delivery or dispersal equipment for such materials.

18.    All telephone records pertaining to calls received from or made by residents of the subject residence.